### TROTT et al. v. CULLEN et al.
### No. 10150.

District Court, D. Colorado.
Nov. 5, 1934.

Northcutt & Northcutt and W. Felder Cook, all of Denver, Colo., Vernon E. Hodges, of Washington, D. C., and Carlton Hill, of Chicago, Ill., for plaintiffs.

Grant, Ellis, Shafroth & Toll and W. W. Grant, Jr., all of Denver, Colo., and Merrell E. Clark, of New York City, for defendants.

SYMES, District Judge.

This is a patent suit by plaintiff Trott, and involves the validity and alleged infringement by defendants of three patents issued to him for improvements in engine mountings, designed principally for use in automobiles. They are No. 1,834,907, as amended, application filed May 27, 1929, patent issued December 1, 1931; No. 1,890,871, application filed November 24, 1928, patent issued December 13, 1932; and No. 1,897,014, original application filed May 27, 1929 (now No. 1,834,907, supra), divided and this application filed November 10, 1931, patent issued February 7, 1933. For convenience they will be referred to as '907, '871, and '014 respectively. In '871 claims 18 to 37 only are here involved.

It is alleged that the three defendants, doing business as the Cullen-Thompson Motor Company, in violation of the rights of the plaintiff and infringing of said patents, caused to be manufactured and sold, and are now selling, engine mountings and structures in Plymouth, Chrysler, and Dodge cars, and among them the so-called "floating power," embodying the inventions described in said patents. It is also charged that the plaintiff submitted his invention to the Chrysler Corporation of Detroit, manufacturers of the cars sold by the defendants, who, in violation of the plaintiff's rights, adopted his ideas and manufactured automobiles equipped with engine mountings infringing plaintiff's rights under the patents without plaintiff's consent or license.

In an amendment to the complaint, it is alleged that the Borg-Warner Corporation of Illinois was granted an exclusive license by the plaintiff to make, use, and sell, and to license others so to do, devices embodying the inventions under these patents, which is still in force and effect; that plaintiff retained the right to bring suit, and the Borg-Warner Company, having refused to join as a party plaintiff, is made party plaintiff without its consent.

It is agreed that the Chrysler Corporation of Detroit, Mich., manufacturers of Chrysler and Plymouth cars, is using on those cars types of mountings which the plaintiff claims are an infringement of his patents. That corporation has appeared and conducted through its counsel, with the other defendants, the defense of this action. The defendants deny infringement, and allege that the said improvements described in the claims of plaintiff's patents in suit were known and used by others in this country before the date of the invention, and more than two years prior to the applications, and cite many other patents as anticipating Trott. And further allege that new matter was inserted in plaintiff's applications after the original filing, and, after plaintiff had knowledge of the structures now charged to infringe, in an effort unjustly to secure claims which would dominate said structures. Other defenses are also pleaded.

In the development of the modern automobile, engine vibration has been one of the big problems. The freedom of the body of the modern de luxe car from engine vibration, as compared to the earlier models, is one of the big advances in the art. Internal combustion engines are now comparatively well balanced mechanically. The mere movement of the parts running free produces very little vibration or movement of the engine block as a whole. But, when the engine is running under load and pulling, a difficult problem of vibration is presented. The intermittent and unequal explosions in the cylinders produce action and reaction. The action pushes the piston and connecting rod down, and causes the main driving shaft to revolve, while the reaction in the opposite direction produces what is called torque, a variable force that manifests itself mainly in a tendency to turn the engine in the opposite direction from what the crankshaft is turning. This and other forces generated by the engine are transmitted to the chassis, or body of the automobile. The amount thereof seems to depend in part, at least, upon the degree of rigidity of the mounting. If the engine unit is rigidly mounted on or bolted to the frame, the resulting vibrations make the car commercially useless. So the

experts and manufacturers have long sought a mounting designed to absorb as far as possible this torque reaction and resulting vibration. This is accomplished in various ways. The underlying principle generally adopted is to permit the engine unit to oscillate relative to the frame.

It will be understood, of course, that the engine unit, which comprises the cylinders, pistons, gears, transmission, fly wheel, and clutch is all inclosed in one solid housing. To the outside of this housing is rigidly attached the carburetor, starting motor, oil filter, fan, water pump, and other accessories. This assembly is very heavy, irregular in shape and in distribution of weight. The object sought in mounting it on the chassis is balance, and a method sufficiently rigid to hold all these moving parts in place as a whole, so they can operate efficiently, and at the same time permit of sufficient freedom of movement in respect to the frame to dissipate, as far as possible, the engine vibrations.

The mountings described in the plaintiff's patents, and the alleged infringing mountings of the defendants, are of the two-point suspension type; that is to say, the engine unit is hung on the frame at two fixed points, which are, with occasional slight variations, in the central longitudinal vertical plane of the engine unit; one in front and one in the rear. Any two points of suspension determine the center or axis of oscillation of a mass; that is to say, when vibrating, it will do so about a line drawn between the two points of suspension, or extensions thereof, and, if this line does not pass through the center of mass or gravity, the resulting vibration will be unequal, and create a new force tending to throw the mass off center.

True, in some mountings, eight and twelve cylinder motors for instance, including some of the Chrysler constructions referred to in this record, the weight of the engine unit is rested upon a support placed underneath the engine block. But the engine unit is left free to move in respect thereto, and the axis of oscillation, as determined by the fixed front and rear points of the mounting, is not changed thereby.

Most of the weight of an automobile engine is of course above the crankshaft. Therefore, if this axis of suspension or oscillation coincides with the crankshaft axis, the engine unit will be decidedly off balance, and, when running, the engine unit will rotate or rock around this longitudinal axis as a center, and the resulting torque reactions will set up a strong vibration. This movement might be so violent at high speeds as to cause the engine unit to tear itself loose if not restrained by other means. This tendency of the engine mass to displace itself is in addition to the rocking or oscillating movement. To illustrate: The propeller shaft and propellor in an airplane engine revolves at high speed without vibration, because the shaft is the center of mass or gravity; that is to say, the weight of the engine and propellor is evenly distributed around the shaft, the same, for instance, as the weight of a wheel is evenly distributed around its axle. But if a piece is broken off one wing of the propellor, the center of gravity, or mass, is shifted, does not coincide with the shaft, and a very serious and dangerous vibration is created.

The experts testified that, if the two points of suspension of an engine unit are so placed in the longitudinal vertical plane of the engine that their axis passes through the center of mass or gravity of the engine unit, the engine, when running, can oscillate or rock around this axis as a center and, theoretically, at least, there will be no tendency for the whole mass to displace itself or jump out of line.

This principle of mechanics, however, is not so simple when applied to automobile engine mountings, as it is in the airplane. For, as already shown, the engine unit is unwieldy, irregular in shape, and, in addition, has rigidly attached to it the accessories mentioned. All of them are power consuming and produce intermittent torque reactions and vibrations of their own, which are communicated to the engine block. Furthermore, the torque reactions from the engine tend to center around the crankshaft. It follows that no constant center of mass can be found which represents the center of all these diverse dynamic and static forces under all the different and variable operating conditions of speed, distribution of weight, intermittent and unequal force of the explosions, etc. So as a practical matter, in any two-point suspension mounting, there will necessarily be some tendency of the entire mass to vibrate and move out of line and assume a new center.

This view was confirmed by the demonstration of the different mountings made during the course of the trial. It was observed that the body vibrations were practically the same in the car with the engine mounted according to Trott's design and the defendants' mounting as exemplified in the Plymouth car. These tests also showed that, with a sudden acceleration of power, the vibrations

greatly increased until the engines settled down to a constant speed, any change in which seemed to require a new adjustment, so to speak.

All the patents under consideration provide for various forms of resilient cushion mountings that permit of movement or play from side to side, and up and down, so as to accommodate and absorb this tendency referred to. Furthermore, they all place the rear point of suspension practically coincident with the universal joint, which is the point where the crankshaft connects with the propellor shaft. This point is below the horizontal plane running through the theoretical center of mass.

Trott's solution of this problem is first disclosed in his patent No. '871. The object of his invention, he states, is to minimize the transmission of engine tremor to the vehicle by supporting the engine unit so as to permit a substantial amount of confined free movement of one end portion of the engine unit, as compared to the other end. He says that the normal operation of the engine unit causes oscillation on the longitudinal axis; that, in the mounting that he has designed, this movement of the rear end of the engine unit is restricted and is relatively less than at the front end so that the engine movement describes a path "approximating an orbit"; that is, the front end of the engine moves in a path like the larger end of a cone, and the mounting at the rear, which comprises the flywheel and transmission, permits of much smaller movement; so that the rear point of suspension is comparatively rigid, while the front point of suspension is built to permit movement of the front end of the engine unit in both a vertical and horizontal plane in respect to the frame. This restrained freedom of movement, it is claimed, causes the engine tremor to be substantially dissipated, thereby materially minimizing transmission of engine vibration to the body of the vehicle.

The form of mounting is aided, as is that in all other mountings considered in this case, by the use of rubber pads, or cushions, springs, etc., at the two points of suspension. These absorb some vibrations.

Trott realized this construction would not wholly solve the problem, and that considerable vibration would still be transmitted and experienced by the occupant of the vehicle. So in '871 he states as a further object that the front end mounting, or point of suspension, is designed to be "connected to the axle in such a manner as to transmit all torque reaction from the power plant to the axle directly," without passing through the frame. This is accomplished, according to the patent, by "a spring connection extending directly between the engine and the front axle," which spring connection carries some of the weight of the engine, and thus transmits torque vibrations directly to the axle.

In short, the mounting disclosed in this patent requires the rear point of suspension to be pivotally mounted directly on a cross-frame member so as to permit torsional action with respect to the frame, and, by the use of a rubber cushion permitting slight distortions of the power plant with respect to this point of suspension, it absorbs some vibration. The front point of suspension is also cushioned, but greater freedom of movement permitted. This front point is supported on a cross spring, the ends of which are mounted directly on the axle with rubber and other cushioning means, which allows transverse movement from side to side of the front of the engine and also vertical movement; these movements being the result of the impulses incident to the operation of the engine.

The net result is that, as the inventor states (Page 3, lines 39–50): "When the engine is in operation, the engine tremor caused as a result of the impulses incident to such operation of the engine unit causes torque cushioning oscillation of the engine unit about a longitudinal axis but the front end portion of the engine unit is permitted to have restrained freedom of movement * * * whereas the back end portion of the engine unit has less freedom of movement or is confined to a smaller degree of orbital movement than the front end."

The rear mounting is spaced further from the cylinders than the front, and the engine operating forces acting thereon are thereby less than in front. A comparatively rigid ball and socket mounting may be used at the rear point of suspension, which is affixed to the frame where the engine crankshaft is connected to the propeller shaft and holds this end of the engine block comparatively rigid. The front suspension is comparatively free, and permits considerable movement of the front end of the engine block in both a vertical and horizontal plane, thus causing what Trott describes as an orbital movement. This may be illustrated by taking one's elbow as the rear point of suspension, resting it on a table as a fixed point, and moving the forearm and hand in a circle.

It is stated in this patent that this reaction (page 2, line 22) has a tendency to revolve the engine around its crankshaft as the center of rotation, and this tendency transmitted to the frame produces the engine sensation. Further (page 4, lines 45–50), the inventor prefers to have the rear mounting concentric with the crankshaft, as the engine tends to rotate or oscillate around its crankshaft as a center, and such a concentric mounting will give better results. And (page 4, lines 55–60) the mounting of the front end of the engine likewise is concentric with the engine crankshaft. And (page 2, lines 38–43) the inventor says that the pivotal mounting means are preferably concentric with the crankshaft of the engine, etc.

This indicates that the two points of suspension called for by the mounting described in '871 are so placed in respect to the engine unit that the vertical oscillation or rocking of the engine unit is around the crankshaft as the axis. This axis being below the center of the mass, with the greater weight above, the vibrations will be correspondingly increased.

In the second Trott patent, No. 1,834,907, the object of the invention is to provide an engine mounting that will absorb the forces incident to the operation of the engine, and hold it in place upon its support, and at the same time providing ample resilience, in so far as the absorption of the torque reaction is concerned. This is accomplished, according to the inventor, by providing (page 1, lines 67–76), "pivotally resilient mounting means between the engine or power plant unit and its support," carrying substantially all the weight without transmitting any of the torque reaction; and a second means or torque connection, between the engine unit and its support, adapted to transmit the torque reaction but to carry substantially none of the weight. In this mounting the two points of suspension, front and rear, are carried, or, as the inventor says, "pivotally mounted" upon cross members rigidly affixed to the main side members of the frame or chassis. These carry the entire weight of the power plant unit, in such a manner as to permit the same pivotal movements of an orbital nature, with respect to the support, without any question as to the security of the mounting. These pivotal mountings are either of rubber construction, metal, or an antifriction ball or roller bearing may be substituted. The inventor states (page 2, lines 62–65) that he prefers the mountings at both ends of the power plant unit to be, as near as practical, concentric with the engine crankshaft. Two torque connection members, one on each side, connect or brace the engine between the side members, and thus transmit the torque reactions to the frame. These may be connected by rubber cubes, coiled springs, or any hydraulic or pneumatic device which will provide a resilient engagement between the engine unit and the frame, and dissipate or dampen the vibrations to a considerable extent.

When the engine is not running, the weight of the power plant is carried by the two pivotal mountings. When the engine is running and pulling, the torque effects transmitted are largely absorbed, according to the inventor, by the resilient connections referred to.

This construction differs radically from that described in '871. In '907 both front and rear supports and the entire weight of the engine are carried on and the vibrations transmitted to the frame, while the '871 construction has the front cross-spring support resting directly on the axle. This involves a different mechanical principle that is sufficient to clearly distinguish it from the Trott '907 mounting and those of the defendant.

Nothing is said in either of Trott's patents about the center of mass, nor was any attempt made originally to place the two points of suspension on an axis passing through the center of mass; it being the idea of the inventor in both to have the points of suspension, and their axes, concentric with the crankshaft. This causes the objectionable tendency to lateral displacement of the mass, in addition to the oscillatory movement. This is anticipated and described in both Trott descriptions, and means are provided to dissipate or dampen it and prevent its transmission to the frame. This is accomplished, as has been described, by the restrained freedom and orbital movement permitted the front of the engine unit in both constructions, and in '907 by the torque side-arms connections, and in '871 by the front cross-spring axle construction.

The other features are not new. The two-point suspension is old in the art, as disclosed by Royce, No. 1,108,242, August 25, 1914; Whitten, No. 1,701,400, February 5, 1929; and Clement, No. 1,000,494, August 15, 1911, cited as anticipating.

The latest of the Lee patents, No. 1,902,509, dated March 21, 1933, owned by the Chrysler Corporation, covers and describes generally the alleged infringing mountings used by the defendants in their 1933 Plym-

outh model, and widely advertised as "floating power." This is the first patent that discusses the so-called center of mass theory. It provides for two points of suspension, so arranged in the longitudinal vertical plane of the engine that their axes will run through the center of mass. Lee states that, when an internal combustion engine is yieldably mounted upon a rigid frame in such a manner as to permit rocking of the engine unit, displacements of center of mass cause reactions upon the rigid frame and excessive vibration. In an automobile these are directed transversely upon the frame. He claims that the magnitude of these transverse vibrations as applied to the frame are proportional to the displacement of the center of mass of the engine and (page 1, lines 47–51), "can be reduced to a minimum by having the engine oscillate about an axis, which passes through its center of mass." He says (page 1, line 91): "The invention consists in providing, upon the motor vehicle frame, mounting members for the power plant unit, including an internal combustion engine, which members shall be of such character and so located as to provide an axis of oscillation passing substantially through the center of mass of the power plant unit, and permit oscillation of the unit about such axis. Thus, the torque reaction impulses will be dissipated in the oscillatory movement of the unit but there will be substantially no displacement of the center of mass because the oscillatory movement of the unit takes place about an axis passing through the center of mass."

His object is, while permitting oscillations of the unit, to prevent substantial displacement of the center of the mass during such oscillations. His rear point of suspension being below the center of mass, Lee elevates the front point twelve to fourteen inches to a point near the top of the engine, and above the horizontal plane of the center of mass, so that the axis of oscillation will run through the center of mass. This, because the rear point must be below the universal joint, not for any mechanical reason, but it is necessary to put it below the floor boards. The same result can be obtained, of course, by placing the two points of suspension on a horizontal plane through the center of mass. This front point rests upon the rigid support 8, Fig. 1, which in turn rests upon the front cross member 2, Fig. 1 (Lee 1,902,509). This line, or axis, makes a vertical angle with the horizontal plane of the engine, the degree or size of which varies, of course, with the length of the engine unit, from a comparatively small angle in a long eight or twelve cylinder engine unit, to the larger angle required for the short block of a four cylinder engine.

Lee uses rubber mountings, front and rear, and speaks of his mounting as yieldable and tiltable; also that, due to the unsymmetrical distribution of mass, the center of mass is not in the vertical plane that passes through the crankshaft axis. In a theoretically perfectly balanced engine a resilient mounting would not be necessary, except to absorb external or road shocks. The novel feature of the Lee construction No. 1,902,509, is the emphasis on the "center of mass" theory already discussed.

As has been shown, the center of mass is not a constant point under all conditions of operation, so that Lee can only approximate an axis of oscillation through the exact center of mass, but does not obtain it. His discussion really admits this, and it is shown by the use of a torque leaf spring connection with the frame side member, which functions the same as the torque arms disclosed in Trott '907 and some of the other patents cited; that is, to dampen and absorb vibrations that otherwise would be transmitted to the frame. It may be that Lee was the first to appreciate the full value of this center of mass oscillation principle, but the idea was not entirely new with him, as shown by Royce, No. 1,108,242, August 25, 1914, who in describing his mounting says (page 1, lines 19–33): "The movement of the engine about its longitudinal axis—which is preferably located so as to pass through or approximately through the center of gravity of the engine—is controlled both by springs and by frictional or other damping devices operating between the engine and the frame so that before any vibration arising from the reaction of the engine can be transmitted to the side members of the frame it must first pass through both the springs and the friction dampers, whereby its effect on the side members of the frame is very considerably reduced." And Masury, No. 1,664,040, March 27, 1928 (page 1, lines 19–23), states he disposes the stresses in a transverse plane, including the center of gravity of the combined structure of engine and generator.

The third Trott patent in suit, 1,897,014, February 7, 1933, is a division of the original application on which his patent '907 was granted. It was filed November 10, 1931, and after the new Plymouth models were publicly shown on July 4, 1931. There is nothing new in the description as compared with that of '907 except, perhaps, a leaf

spring torque arm. The discussion of '907 applies equally to this patent.

Rubber cushioning means used in connection with a mounting that permits oscillation about a longitudinal axis was disclosed as early as August, 1925, in Whitten No. 1,701,400, February 5, 1929, application filed August 3, 1925.

To sum up this part of the case: That part of the Trott construction found in No. 1,890,871 that discloses the front point of suspension of an automobile engine mounting carried on a cross-leaf spring, which in turn rests with resilient connections upon the front axle, thus transferring a substantial part of the weight and torque reactions of the engine from the frame directly to the front axle and tires, is new, novel, not disclosed in the previous art, and is patentable. There is nothing new in the rest of this construction, and this patent is not infringed by anything disclosed in the mountings of the defendant Chrysler Corporation in suit.

The structure embodied in the Trott patents, Nos. 1,834,907 and 1,897,014, consists of an automobile engine mounting with two-point suspension, the axis of which is concentric with or below the crankshaft axis. This causes a lateral movement or tendency of the engine unit to displace itself. Means are provided to absorb and dissipate this, as well as the oscillatory vibrations, first, by mountings that permit it to move in respect of the frame with a limited freedom described as orbital movement; second, by the use of rubber, or other equivalent resilient devices, at the front and rear points of suspension; and, third, by the use of resiliently connected torque arms between the frame and engine that restrict the movement of the engine in respect to the frame, and absorb, as far as possible, the remaining vibrations transmitted by the torque arms transversely to the frame. These two patents are combinations of old elements, not attaining new results, and fail to disclose inventive skill.

Lee, in patent No. 1,902,509, develops the mechanical principle that an automobile engine unit, when mounted at two fixed points, so placed in a longitudinal verticle plane of the engine, that their axis will run through the center of the mass, will oscillate on that axis without a tendency to lateral displacement. This is theoretically sound, and his construction eliminates vibrations to a slightly greater extent, perhaps, than any other disclosed in this record; but, for the reasons heretofore stated, some tendency to angular displacement remains, and like Trott, he employs torque arms and cushioning devices to absorb it.

The field is a crowded one, and Lee, while entitled to credit for an advance in the art, discloses nothing new and novel, and combines only old elements.

It would seem from this record that Trott was the first to apply the term "floating" to engine mountings.

In 1928 Trott equipped a Ford model A with an engine mounting which was a forerunner of his '871 design. It included a subframe which carried the engine and was mounted on the axles at both ends. He demonstrated this to defendant Cullen in Denver, who was evidently impressed with Trott's idea. In 1929 Trott equipped a Ford model A with an '871 mounting in which the front of the engine was carried by a leaf spring mounted on the front axle. In the latter part of 1929 he drove this car East and demonstrated it to the Chrysler Corporation at Detroit, and to a number of other automobile manufacturers. Thereafter, in February, 1930, he drove this car to Chicago and contacted Mr. Lyman of the Borg-Warner Corporation. Mr. Lyman tested the car, and on his recommendation, the Borg-Warner Corporation took an exclusive license from Trott. Being in touch with the Chrysler Corporation, he called it to their attention and had several conferences with their experts in Detroit. The Borg-Warner and Chrysler engineers collaborated in studies and possible improvements of the Trott '871 mounting, and about August, 1930, installed it in three Plymouth cars for demonstration purposes. In the course of the negotiations, which concerned mostly, if not exclusively, the so-called front cross-spring axle feature, Mr. Harness, patent counsel of the Chrysler Corporation, visited the attorney for Borg-Warner and examined the Trott applications. On March 4, 1931, the Chrysler Corporation notified Borg-Warner they were no longer interested in the Trott mountings. This is all there is to support the allegation in the bill that Chrysler stole and embodied Trott's ideas in its new mountings, widely advertised as "floating power." It does show that both Chrysler and Borg-Warner thought that this particular Trott mounting had merit, and spent considerable time investigating its practicability.

It is true Mr. Harness had the opportunity to acquaint himself with the contents of the Trott applications, but there is no evidence that any novel idea was lifted therefrom and used by Chrysler. The only dis-

closure Trott made to Chrysler was this front cross-spring axle mounting. On the witness stand Trott said (Rec. p. 119): "I contributed" (to the art) "a two-point mounting on rubber on opposite sides of the flywheel housing, or the flywheel so placed that the engine unit would be in balance and would be permitted to have controlled freedom of movement with respect to the frame," etc.

As pointed out, there is nothing new in a two-point mounting as such, and the use of rubber, or the other cushioning devices suggested, is of course old. Nor is "controlled freedom of movement" so-called, new. Furthermore, the statement that the engine unit would be in balance is contrary to his teachings, which assume the engine unit to be out of balance, and provide means to absorb resulting vibrations.

At the request of the court, counsel filed proposed findings of fact and conclusions of law, which have been very helpful. They may now, without reargument, file a brief memorandum, pointing out which of these findings, in whole or in part, conform with the views herein expressed, and a suggested form of final decree.